**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

**SHANTIA HASSANSHAHI**
also known as **SHANTIA HASSAN SHAHI**
also known as **SHAHI**
also known as **SHANTIA HAAS**
also known as **SEAN HAAS**

and

**HASSTON, INC.**

I, Joshua J. Akronowitz, being first duly sworn, depose and state as follows:

**AFFIANT'S BACKGROUND**

1. I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI") and have been so employed since September 2007. I am a graduate of the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia. At FLETC, I was trained in, among other things, criminal investigative techniques. I have participated in criminal investigations involving, among other things, the illegal export of goods from the United States. I have received formal training in the laws and regulations relating to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C §§ 1701-1706, and the Iranian Transactions Regulations ("ITR"), 31 C.F.R. Parts 560.203 and 560.204. I have conducted and participated in investigations of the above listed laws and regulations.

2. I have personally participated in this investigation and have witnessed many of the facts and circumstances described herein. In addition, I have received information from other federal law enforcement officials. I also have reviewed documents obtained during the course of the investigation. The statements contained in this affidavit are based on my own observations and review of documents, or reliable information provided to me by other law enforcement personnel and by private citizens. This affidavit is being submitted for the limited purpose of supporting a criminal complaint. I am setting forth only those facts and circumstances necessary to establish probable cause for the issuance of the requested complaint. Unless otherwise indicated, all written and oral statements referred to herein are set forth in substance and in part, rather than verbatim.

## PURPOSE OF AFFIDAVIT

3. This affidavit is in support of a criminal complaint charging **SHANTIA HASSANSHAHI, also known as SHANTIA HASSAN SHAHI, also known as SHAHI, also known as SHANTIA HAAS, also known as SEAN HAAS ("HASSANSHAHI"); and HASSTON, INC.,** with having violated IEEPA (50 U.S.C. § 1705) by conspiring to export goods to Iran without first having obtained the necessary export license.

## EXPORT CONTROL LAWS AND REGULATIONS

4. The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C §§ 1701-1706, authorizes the President of the United States ("the President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy or economy of the United States when the President declares a national emergency with respect to that threat. Pursuant to the authority under the IEEPA, the President and the executive branch have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving U.S.-origin goods.

5. Beginning with Executive Order No. 12170, issued on November 14, 1979, the President has found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and … declare[d] a national emergency to deal with that threat."

6. On May 6, 1995, the President issued Executive Order No. 12959, adopting and continuing Executive Order No. 12170 (collectively, the "Executive Orders"), and prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person. The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the ITR, implementing the sanctions imposed by the Executive Orders.

7. The Iranian Transactions Regulations ("ITR"), 31 C.F.R. Part 560, generally prohibit any person from exporting or causing to be exported from the United States any goods, technology, or services without having first obtained a validated export license from the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), which is located in the District of Columbia. The ITR imposes, among others, the following prohibitions:

> Section 560.203 - Prohibition of any Transaction to Evade or Avoid the Embargo and any Attempt to Violate the Embargo:

> Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.
>
> Section 560.204 - Prohibition of any Sale or Supply of any Goods, Technology, Services to Iran or the Iranian Government:
>
> Except as otherwise authorized [by a license issued by OFAC], the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:
>
> > (a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran . . .
>
> Section 560.314 – United States Person; U.S. person:
>
> The term *United States person* or *U.S. person* means any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States.

8. On October 15, 2007, the IEEPA was amended to include a criminal conspiracy provision and an increased fine. Title 50, United States Code, Section 1705 provides in pertinent part:

> (a) Unlawful acts
>
> It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter.
>
> \*   \*   \*
>
> (c) Criminal penalty
>
> A person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) of this section shall upon conviction, be fined not more

than $1,000,000, or if a natural person, may be imprisoned for not more than 20 years, or both.

## FACTUAL BASIS FOR PROBABLE CAUSE

9. It is my experience and the experience of law enforcement officers with whom I work, that individuals and companies attempting to circumvent the current United States embargo against Iran will export or cause to be exported goods and technology to companies located in non-embargoed countries for transshipment to end-users in Iran.

10. Since August 2011, HSI Washington, DC ("HSI-DC") has been investigating the attempted procurement of "protection relays" by individuals associated with or attempting to do business with the Government of Iran, specifically the Ministry of Energy, for apparent use in the Iranian national electrical power grid. Protection relays are complex electromechanical devices that are incorporated into and designed to calculate operating conditions on electrical circuits. Protection relays are generally intended to trip circuit breakers when a fault in the circuit is detected, for the primary purpose of preventing damage, malfunctioning, or "blackouts" of an electrical circuit or power grid.

11. In September 2011, as part of an ongoing criminal investigation, HSI-DC identified a company in Iran (hereinafter referred to as "HIMAFAN") involved in the procurement and exportation of protection relays from different companies located in the U.S. and Canada. HSI-DC determined that two individuals, an "M. Sheikhi" and "Mohammad Reza BABAEI", both Iranian nationals, were the primary agents involved in the operation of HIMAFAN's procurement and export activities. HSI-DC's investigation also revealed that over the course of several years, beginning in and around 2009, "Sheikhi", on behalf of HIMAFAN, procured protection relays from **HASSTON, INC. ("HASSTON")**, a company incorporated in California and located at 1636 Castlehill Ct., Westlake Village, CA 91361, through its owner **SHANTIA HASSANSHAHI**, **also known as SHANTIA HASSAN SHAHI, also known as SHAHI, also known as SHANTIA HAAS, also known as SEAN HAAS ("HASSANSHAHI")** (DOB: 4/18/1955), an Iranian-born U.S. Citizen residing in California, for export to Iran in violation of the IEEPA and ITR.

### Background

12. On August 16, 2011, an HSI-DC agent received an unsolicited e-mail from a voluntary source associated with this investigation (the "Source" or "IT"), indicating that the Source had received a request from "M. Sheikhi" ("Sheikhi"), on behalf of "Radyab Bartar Company," to buy protection relays manufactured by a company identified herein as "COMPANY A." The Source stated that IT had information that "Sheikhi" sought the protection relays for use in an Iranian power project, but IT would only discuss the matter further with HSI agents in person.

13. Based on the above information, on or around September 20, 2011, I and another HSI-DC agent interviewed the Source. During the interview, the Source summarized his prior contacts and conversations with "Sheikhi", stating, in sum and substance:

    a. On or around August 6, 2011, "Sheikhi" e-mailed the Source and solicited the Source's assistance in procuring U.S.-origin protection relays for "Sheikhi's" company, Radyab Bartar Company, located in Iran. "Sheikhi" advised the Source that "Sheikhi" traveled to Vienna often, had an office there, and proposed that "Sheikhi" and the Source do business there.

    b. "Sheikhi" also asked the Source whether, based on the Source's past professional experience, the Source would serve as a broker for the procurement of U.S.-origin protection relays for use in Iran. In particular, "Sheikhi" asked the Source to identify U.S.-based entities with ties to "COMPANY A" that could assist with procuring protection relays from COMPANY A for export and end-destination in Iran. "Sheikhi" further told the Source that if the Source was successful in brokering the procurement of protection relays from COMPANY A in this instance, "Sheikhi" may seek to include the Source in similar and more profitable procurement transactions in the future. The Source also gave HSI a copy of the above-referenced e-mail sent by "Sheikhi" to the Source.

14. After interviewing the Source, I independently sought to corroborate the Source's information concerning "Sheikhi" and "Radyab Bartar Company," and their purported interest in procuring U.S.-origin protection relays manufactured by "COMPANY A" for use in Iranian power grids. My investigation revealed the following:

    a. A review of "Sheikhi's" business card, which was included in the e-mail from "Sheikhi" to the Source, indicated that: (1) "Sheikhi's" full name is Manouchehr "Sheikhi"; (2) "Sheikhi" purports to be the "General Manager" for Radyab Bartar Company; (3) the business address listed for Radyab Bartar Company is in Tehran, Iran; (4) the listed business telephone numbers for "Sheikhi" at Radyab Bartar Company begin with "98"—the country code for the Islamic Republic of Iran.

    b. According to open source information, Radyab Bartar Company's website, www.radyabco.com, was registered with Night and Day Designers at www.shaborooz.ir, and by a registrant having an address in Tehran, Iran. Based on my experience, I know that website domain addresses having the suffix ending in "ir" resolve to Iran.

    c. According to open source information, COMPANY A is an international company based in France with manufacturing plants and offices in the United States, Canada, and Australia, specializing in the business of manufacturing sophisticated protection relays for use in various electrical systems, including electrical power grids.

### Identification and Border Search of HASSANSHAHI

15. Using the business telephone number associated with "Sheikhi", I searched HSI-accessible law enforcement databases, in furtherance of identifying potential U.S.-based targets engaged in the sale or export of protection relays for use in the Iranian electrical power grid.  As a result of my search, I discovered telephone call log records indicating that a number of telephone calls between "Sheikhi's" known business telephone number and telephone number 818-971-9512 had occurred within a relatively narrow time frame.  Based on my training and experience, I know that area code "818" is an area code originating in Los Angeles County, CA.

16. On or about October 6, 2011, I prepared and served an Administrative Export Enforcement Subpoena for subscriber information for telephone number 818-971-9512 on Google, Inc. ("Google"), the U.S.-based service provider.  In response, Google produced the following subscriber information for the telephone number:

    | | |
    |---|---|
    | Name: | Shantia **HASSANSHAHI** |
    | E-mail: | shantia34@gmail.com |
    | Address: | 1636 Castlehill Ct., Westlake Village, CA 91361 |
    | Alt Phone Number: | 805-857-4669 |
    | Created on: | 2010 Jun 17    09:52:20 |
    | Signup IP: | 72.134.19.172 |

    In addition, Google produced call log information for the telephone number during the period of September 6, 2011, to October 6, 2011, which revealed numerous outgoing calls made to telephone number 98-938-1911602.  Again, based on my training and experience, I know that the country code for the Islamic Republic of Iran is "98."  Accordingly, it appeared that **HASSANSHAHI**, using a U.S.-based telephone number suspected of having a connection to the suspected procurement network (i.e., 818-971-9512), made numerous calls to the same Iranian-based telephone number during a relatively finite period of time.

17. Based on the above information, on or about December 20, 2011, I prepared and served an Administrative Export Enforcement Subpoena for subscriber information and recent Internet protocol logs for **HASSANSHAHI**'s purported e-mail account, shantia34@gmail.com, on Google.  On January 10, 2012, Google produced Internet protocol information concerning the e-mail account, which indicated that **HASSANSHAHI** accessed the e-mail account twenty-four times from December 8-15, 2011, while located in Iran.

18. On January 11, 2012, I received information indicating that **HASSANSHAHI** would be flying into the Los Angeles International Airport (LAX) on Lufthansa Airlines (LH) flight #456 from Frankfurt, Germany.  Accordingly, I requested that HSI Los Angeles,

      CA (HSI-LAX) conduct a secondary examination of **HASSANSHAHI** upon his anticipated arrival into the United States.

19. On January 12, 2012, at approximately 12:40 P.M. PST, **HASSANSHAHI** arrived at LAX on flight #456 from Frankfurt, Germany. **HASSANSHAHI** presented himself for primary inspection to U.S. Customs and Border Protection (CBP) Officers in the Federal Inspection Service (FIS) area, who thereafter referred **HASSANSHAHI** to the secondary inspection area for further examination. At the time, **HASSANSHAHI** had in his possession a laptop computer, multimedia cards, thumb drives, a camcorder, SIM cards, and a cell phone (collectively, the "electronic devices"). CBP detained these items and turned them over to HSI-LAX, who subsequently mailed them to HSI-DC for electronic imaging.

20. Upon receipt, HSI-DC forensically imaged the electronic devices. Among other things, a review of the contents of the electronic devices, particularly the laptop computer, revealed the following:

    - A copy of the Articles of Incorporation for **HASSTON**, indicating that it was incorporated on March 16, 2009, and is located in Westlake Village, CA. According to the California Secretary of State's website, **HASSANSHAHI** is **HASSTON**'s registered agent. Notably, the business address provided for **HASSTON** was also **HASSANSHAHI**'s then home address. Moreover, while **HASSTON**'s public website indicates that it is "under construction," open source information indicates that **HASSTON**'s domain name is registered to **HASSANSHAHI**.

    - A document entitled "Memorandum of Understanding and Cooperation" dated on or about December 31, 2009, regarding HIMAFAN, signed by **HASSANSHAHI** and "BABAEI"

    - The first Article, entitled "Article 1: The Parties to the Memorandum" provided the date of the agreement being entered into of December 31, 2009. The parties listed were **HASSANSHAHI** (referred to as 2nd party) with an Iranian address, which I later identified as belonging to his Iranian company used to facilitate the arrival of these protection relays into Iran (hereinafter referred to as "KIAN DAY"), and HIMAFAN (referred to as the 1st party) also with an Iranian address. The second article, entitled "Article 2: The Objective of Memorandum" included the stated goal was to contact the U.S./Canadian company (hereinafter referred to as "COMPANY A") and to provide items needed by the 1st Party for sale in the country. The fourth article, entitled, "Article 4: The Undertakings by the 1st Party" explained the following in three distinct bullets:

        a. "Providing guarantees needed for entering into contracts with the 3rd party companies for the sale of items purchased from

        COMPANY A by the 2nd party."

- b. "Receipt of payments for the purchased items from the 3rd party company and paying the 2nd party for payment to COMPANY A in Canada."

- c. "Clearance of goods shipped by the 2nd party through the Customs in Armenia and their shipment to and clearance in Tehran."

The fifth article, entitled, "Article 5: The Undertakings by the 2nd party" stated, "Procuring equipment (with payments from the First Party to be received through agreements with the 3rd party company) requested by the 1st party from COMPANY A in Canada and delivering them to the representative of the 1st party at the Customs in Armenia.

- Contact information for a company called HIMAFAN located and doing business in Tehran, Iran. Open source information found on the Internet indicates that HIMAFAN is "a leading provider of products, systems, and services of the Transmission and Distribution industry . . . ." Notably, my review of the call log records for telephone number (818-971-9512)—serviced by Google and subscribed to by **HASSANSHAHI**—appeared to show that HIMAFAN's known business telephone number had been used to place a number of calls to **HASSANSHAHI**.

- Hundreds of e-mails sent and received by **HASSANSHAHI** in furtherance of the business of **HASSTON** and KIAN DAY. When conducting business through **HASSTON**, **HASSANSHAHI** frequently used the following e-mail signature block, identifying **HASSANSHAHI** as the President of **HASSTON** and listing shantia34@gmail.com as the contact e-mail address for him in that capacity:

    Shantia Hassanshahi
    Hasston, Inc..-President
    (805) 857-4246 - U.S. Office
    (213) 417-4086 - VOIP Phone
    (310) 651-9680 - US Fax
    +44 (1273) 311-461 UK Office3
     shantia34@gmail.com <mailto:shantia34@gmail.com>

- When conducting business through KIAN DAY, **HASSANSHAHI** frequently used the following e-mail signature block, identifying **HASSANSHAHI** as the President of KIAN DAY located in Tehran, Iran:

    Shantia Hassanshahi
    Kianday, Inc. - President

      Phase I Block A4 Entrance 11, Suite 419
      Ekbatan, Tehran - Zip Code 13947-43876 Iran
      +98(21) 4464-6324 - Office
      +98(935) 4464-6324 - Mobile
      +44(1273) 311-461 - UK Office

22.  Moreover, the following documentation was found on **HASSANSHAHI**'s laptop computer, establishing that in 2009, **HASSANSHAHI**, through **HASSTON**, had purchased approximately $6,000,000 worth of goods from COMPANY A (in Canada) that were exported to Armenia and then transshipped to KIAN DAY in Iran.

- An e-mail **HASSANSHAHI** sent on June 28, 2009, attached to which was a pro forma invoice issued by Armandey, an Armenian company, to KIAN DAY in Tehran, Iran, bearing purchase order number "P-06102009," and identifying KIAN DAY and **HASSANSHAHI** as the intended recipients of the goods in Iran.

- Shipping records from COMPANY A in Canada, falsely indicating that the ultimate consignee and destination for the shipment was Armandey, in Yerevan, Armenia.

- The below letter (translated from Farsi to English), dated September 5, 2011, authored by **HASSANSHAHI** and addressed to Majid Namjoo, the Iranian Minister of Energy, which detailed the Iranian Ministry of Energy's 2009 procurement of COMPANY A protection relays from **HASSANSHAHI**, through **HASSTON**, for use by the Fars Regional Electric Company in Iran. (The name of the company has been substituted with "COMPANY A" in the body of the letter below.)

Date: September 5, 2011

Engineer Namjoo
Honorable Minister of Energy

RE: Procurement of Relays for Fars Regional Electric Company

Greetings,

You are respectfully informed that Fars Regional Electric Company called for bids for the purchase of protective relays for transmission lines in '88[1]. The purchasing documents and participation in the bid were handled by an intermediary company called Permayon.

It was agreed that Permayon Company would act as an intermediary between my company in the United States and Fars Regional Electric Company and that it would appear for the bid offer and proceed with providing the guaranties and financing of the project.

Unfortunately, after winning and entering into a contract in the amount of 1,250,000 United States dollars with Fars Regional Electric Company, the intermediary failed in its financial obligations, both when receiving the advance payment from the main client and when it had to make payments to me during the completion of the project so that I could pay the manufacturer, COMPANY A. To date, the sum of 500,000 dollars out of 1,000,000 dollars has been paid by the intermediary company. But given the obligations that I had and still do have to COMPANY A, the project payments had to be made in due time. In order to settle up with COMPANY A, I have made one payment of 200,000 dollars. I was given credit for three months by COMPANY A. Unfortunately, six months after the delivery of all items to the intermediary company and the main client, no payments have been made by the main client so that I can settle up the remaining 300,000 dollars with the manufacturer.

After many inquiries, the intermediary company stated that it is unable to pay what I am owed and sidestepped its obligations and pointed to Fars Regional Electric Company as being responsible for payments.

In a letter, Fars Regional Electric Company reassigned payment of 50 per cent of its debt to Tavanir Company. This was supposed to be paid by Tavanir by the end of the month of Mordad[2] of the current year, but that has not materialized as of now. The remaining 50% was supposed to be paid by Fars Regional Electric Company in the beginning of the month of Mehr[3] of the current year, but as of now, that also remains unclear.

---

[1] This Persian calendar year corresponds to the period from March 21, 2009 to March 20, 2010 (Translator's note.)
[2] This Persian calendar month refers to the period from July 23 to August 22, 2011 (Translator's note.)
[3] This Persian calendar month refers to the period from September 23 to October 22, 2011 (Translator's note.)

TRANSLATION NUMBER 184013. TRANSLATION FROM FARSI. Namjoo TR areva to company aPage 1 of 2

Considering the above, the losses and damages, my unfulfilled obligations to COMPANY A, I am left in a situation where it is feared that the manufacturer may bring a lawsuit against me in American courts for failure to act under obligations. And given that I am an Iranian and that these items are subject to sanctions and the fakeness of the end user, the worst will be expected.
In view of what has been stated, I ask your honor's favorable view and giving of instructions to persons in charge for a speedy settlement of the accounts with me.
I thank you very much in advance for your honor's attention.

Thank you,
Shantia Hassanshahi

TRANSLATION NUMBER 184013. TRANSLATION FROM FARSI. Namjoo TR areva to company aPage 2 of 2

- On September 5, 2011 HASSANSHAHI sent a letter similar to the one above to Tavanir Co., an Iranian company. This letter, like the one above, outlines the procurement of COMPANY A protection relays for the Iranian Fars Regional Electric Power Company using **HASSANSHAHI**'s U.S. company, **HASSTON**. In addition this letter also addresses the sanctions on Iran and the need to use fake end-users and Asian countries to divert their shipments. This letter appears below.[1] (The name of the company has been substituted with "COMPANY A" in the body of the letter below.)

---

[1] On September 19, 2011 **HASSANSHAHI** sent a letter to Iranian Minister or Energy Namjoo as a follow-up expressing most of the points as stated in the September 5, 2011



In the Name of God,

Date: September 5, 2011

Engineer Haeri
Honorable Chief Executive of Tavanir Company

RE: Procurement of Protective Relays for Fars Regional Electric Power Company

Greetings,

Respectfully, I would like to inform you that Fars Regional Electric Power Company called for bids for the purchase of protective relays for transmission lines in '88[1]. The purchasing documents and participation in the bid were handled by an intermediary company called Permayon. It was agreed that Permayon Company would act as an intermediary between my two companies–Hasston in the United States and Himafan Company in Iran–and Fars Regional Electric Power Company, and that it would appear for the bid offer and proceed with providing the guarantees and financing of the project.

Unfortunately, after winning and entering into a contract in the amount of 1,250,000 United States dollars with Fars Regional Electric Power Company, the intermediary company failed to act on its financial obligations, both when receiving the advance payment from the main client and when it had to make payments to me during the completion of the project so that I could pay the manufacturer, Company A. To date, the sum of 500,000 dollars from the manufacturer's sale price of 1,000,000 dollars has been paid by the intermediary company. But given the obligations that I had and still have towards Company A, it had been agreed that the project payments would be made in due time. In order to settle up, I personally have paid 200,000 dollars as a partial payment of the amount owed to Company A and because of my standing, I have obtained from Company A a deferral for three months. Unfortunately, six months after the delivery of all the items in the contract to the intermediary company and Fars Regional Electric Power Company, no payments have been made by the main client-



Address Redacted
(805) 857-4246 - US Office
Address Redacted , CA 91361
9680 - US FAX
(310) 651-9680 - US FAX
(213) 417-4086 – VOIP Phone
ahantla54@gmail.com

---

[1] This Persian calendar year corresponds to the period from March 21, 2009 to March 20, 2010 (Translator's note.)

TRANSLATION NUMBER 185878.  TRANSLATION FROM FARSI.  Hasston letterhead to Haeri areva to company a
Page 1 of 2



so that I can pay the remaining 300,000 dollars to the manufacturer. It should be mentioned that I have to pay the entire amount that I owe to the manufacturer by October 2011 (That is, in less than 20 days.) If Company A is not paid by the said date, that company will probably begin to look into the address and information of the fake user in the Central Asian countries. This would mean giving away the diverted itineraries of the *High Tech* goods to our country!

After many inquiries, the intermediary company stated that it is unable to pay what I am owed and sidestepped its obligations and pointed to Fars Regional Electric Power Company as being responsible for payments.

In a letter, Fars Regional Electric Power Company reassigned the payment of 50 percent of the amount it owes to Tavanir Company. Tavanir was supposed to pay this by the end of the month of Mordad[2] of the current year at the latest, but that has not materialized as of now. The other portion of the amount owed to me was supposed to be paid by the Regional Electric Power Company in the beginning of the month of Mehr[3] of the current year, but based on the current information, that also remains unclear.

In consideration of the above, the losses and damages incurred, the waste of more than one month for travel to Iran – while leaving my company in the United States unattended – to appear in the Ministry of Energy to resolve this matter, I ask you to note that my unfulfilled obligations toward Company A puts me in a critical and worrisome situation where it is feared that the manufacturer may bring a lawsuit against me in American courts for breach of agreement. Since I am an Iranian and that these *High Tech* items are subject to sanctions and that the address and information of the end user is fake, the worst legal problems will be expected.

Based on what has been stated, I ask for your honor's favorable view and giving of instructions to persons in charge for a speedy payment of the total or at least 300,000 dollars of what is owed to me so that I pay the manufacturer and avoid the aforementioned risks.

I thank you very much in advance for your honor's attention.

Thank you,
Shantia Hassanshahi

Copy to: Engineer Namjoo, the Honorable Minister of Energy, for your information and ordering speedy action



1636

Address Redacted
(805) 857-4246 - US Office
Address Redacted, CA 91361
(310) 651-9680 - US FAX
(213) 417-4086 – VOIP Phone

---

[2] This Persian calendar month refers to the period from July 23 to August 22, 2011 (Translator's note.)
[3] This Persian calendar month refers to the period from September 23 to October 22, 2011 (Translator's note.)

TRANSLATION NUMBER 185878. TRANSLATION FROM FARSI. Hasston letterhead to Haeri areva to company a
Page 2 of 2

sharida34@gmail.com

TRANSLATION NUMBER 185878. TRANSLATION FROM FARSI. Hasston letterhead to Haeri areva to company a
Page 3 of 3

- On September 5, 2011, the Chief Executive of the intermediary Iranian company, Permayon, wrote a letter to the Iranian Minister of Energy expressing its version of events regarding the procurement of protection relays from COMPANY A. The writer stated Permayon divided its purchases into several phases when it placed orders for COMPANY A goods because it believed that low dollar amounts would not be noticed or scrutinized as closely and, specifically, that the true Iranian end-users for the goods would not be discovered.

23. Also found on **HASSANSHAHI**'s laptop computer was a letter (translated from Farsi to English), dated September 27, 2011, signed by **HASSANSHAHI** as "CEO/Managing Director" on KIAN DAY letterhead, and addressed to Majid Namjoo, the Iranian Minister of Energy. In the letter, **HASSANSHAHI** introduced KIAN DAY to the Iranian Minister of Energy as "founded in partnership with domestic engineers and Iranian investors residing overseas in order to obtain Hi-Tech technology, and localization of present-day science for the purpose of manufacturing small electrical meters." **HASSANSHAHI** then stated: "With the support of the honorable government of the Islamic Republic of Iran, our engineering group hopes to take effective steps in serving our beloved country and the electrical power industry."

24. Documentation found on **HASSANSHAHI**'s computer revealed that on November 19, 2011, and December 13, 2011, documents were filed by HIMAFAN and Permayon, respectively, at the Ministry of Justice of the Islamic Republic of Iran. The document filed by HIMAFAN claimed Permayon breached its financial obligations by not making payments, specifically to **HASSANSHAHI**, for the manufacture of goods. Permayon responded to this claim by calling the allegations unfounded and stated it was in fact HIMAFAN who caused the loss of confidence of the party to the FARS Electric contract.

25. Also found on **HASSANSHAHI**'s laptop computer was a letter authored by "Reza Baba'i" and addressed to Dr. Ayoub Shaban that specifically referenced various past and future engineering projects in Iran, for which **HASSANSHAHI** and his U.S. and Iranian companies are supplying the goods. Among other things, Baba'i stated the following in sum and substance:

    - "KIAN DAY Company (Baba'I – Shantia [**HASSANSHAHI**]) is working in the meter business, and that business was conducted by Hima [HIMAFAN] in Iran and with the support of Shantia [**HASSANSHAHI**] in America."

    - "Not considering Shantia [**HASSANSHAHI**] in business affairs is also a lie. Shantia [**HASSANSHAHI**] knows every business with everyone we have in Iran and abroad regarding relays and meters. We are partners. To date, we have over $3 million dollars in projects, and all of them has come through Shantia [**HASSANSHAHI**].

26. Also found on **HASSANSHAHI**'s laptop computer was an e-mail string between **HASSANSHAHI** and "Mark Babaei" in October 2009, concerning their intended transshipment of goods from Iraq into Iran. According to the e-mail string, on at least two occasions in 2009, **HASSANSHAHI**, doing business as **HASSTON**, ordered and shipped protection relays from "COMPANY A" in Canada to Iraq for declared use in the "Kurdistan Power Project" located there. In reality, however, the final destination for these relays was Iran. Throughout the e-mail string, **HASSANSHAHI** and "Babaei" discussed the logistics involved in moving the goods shipped to Iraq to the Iranian border for ultimate transshipment to that country. From my training and experience, had **HASSANSHAHI** accurately declared that Iran was the ultimate consignee for the goods, he would have been prohibited from shipping the goods there due to current sanctions against Iran.

27. HSI-DC has also contacted the U.S. Department of Treasury's Office of Foreign Asset Control ("OFAC") to ascertain whether **HASSANSHAHI, HASSTON,** or KIAN DAY have ever applied for an export license, authorizing **HASSANSHAHI, HASSTON,** or KIAN DAY to export any goods to Iran. **HASSANSHAHI, HASSTON, and** KIAN DAY have never applied for or obtained a license from OFAC, which is located in the District of Columbia, to export any goods to Iran.

28. In sum, I submit that there is probable cause to conclude that from at least 2009 to the present **SHANTIA HASSANSHAHI, also known as SHANTIA HASSAN SHAHI, also known as SHAHI, also known as SHANTIA HAAS, also known as SEAN HAAS, and HASSTON, INC**, both being "U.S. persons," have conspired to export goods to Iran without first having obtained the required export license from OFAC, in violation of the IEEPA, 50 U.S.C § 1705, and the ITR, 31 C.F.R. §§ 560.203 and 560.204.

        Joshua J. Akronowitz, Special Agent
        U.S. Department of Homeland Security
        Homeland Security Investigations

Subscribed and sworn before me this _____ day of January, 2013.

UNITED STATES MAGISTRATE JUDGE